***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Gregory. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Gregory.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are properly before the Commission, the Commission has jurisdiction of the parties and of the subject matter, and the parties are bound by and subject to the provisions of N.C. Gen. Stat. § 97-1et seq.
2. The parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. In addition to the other stipulations contained herein, the parties hereto stipulate and agree with respect to the following undisputed facts:
(a) That defendant-employer has three or more employees and is subject to the Act;
(b) That on or about February 2, 2002, plaintiff was employed by defendant-employer and earned an average weekly wage of $769.22 per week yielding a compensation rate of $513.07;
(c) Plaintiff made a knowing, voluntary, affirmative and counseled decision to pursue his workers' compensation claim in the State of North Carolina before the North Carolina Industrial Commission and in no other jurisdiction;
(d) Jurisdiction is proper before the North Carolina Industrial Commission;
(e) Defendants paid all mediation expenses in connection with plaintiff's workers' compensation claim herein and plaintiff did not paid any portion of said expenses, either directly or by way of reimbursement.
4. The following is a list of all known exhibits plaintiff may offer at the trial:
(a) Medical records and medical bills.
5. The following is a list of all known exhibits defendants may offer at trial:
(a) All of employee's medical records in possession of either party. (Defendants expressly reserved the right to take the deposition testimony of any physician who has examined plaintiff.)
(b) Plaintiff's verified responses to defendants' First Set of Request for Production and Interrogatories identified as plaintiff's answers to defendant's First Set of Interrogatories, dated August 26, 2002 and verified September 16, 2002.
(c) All Industrial Commission forms prepared by either party in this matter, expressly including:
i. Form 18 completed on April 18, 2002;
ii. Form 19, completed February 19, 2002, with attached electronic mail message from plaintiff;
iii. Form 61, completed on March 27, 2002;
iv. Form 18M, completed on March 6, 2002;
v. Form 33, completed on May 14, 2002; and
vi. Form 33R, completed on July 30, 2002.
(d) An Initial Accident Health Claim Form, dated February 26, 2002;
(e) Plaintiff's recorded statement taken on February 21, 2002; and
(f) A cancelled check drafted on an account of Mark Nugent and endorsed by plaintiff in the amount of approximately $250.00.
6. Each of the exhibits listed above in paragraphs 4 and 5 are genuine, and if relevant, that such exhibits can be received in evidence without further identification, authentication or proof. All parties reserve the right to object to any exhibit, at hearing, on the grounds of relevance.
7. The issues to be determined are as follows:
 Has plaintiff established, by the greater weight of the competent evidence, that he sustained an injury by accident to his back on or about February 2, 2002? If so, then has plaintiff established, by the greater weight of the competent evidence, that he was disabled from work (totally and/or partially) at anytime thereafter? If so, then has plaintiff established, by the greater weight of the competent evidence, that any medical treatment is related to his injury by accident, and that it is designed to effect a cure, provide relief, or lessen the period of his disability; and
 What benefits, if any, is plaintiff entitled to under the North Carolina Workers' Compensation Act.
 STIPULATED EXHIBITS
1. At the hearing, the parties stipulated into evidence six exhibits consisting of plaintiff's medical records labeled Stipulated Exhibit #1, plaintiff's answers to defendants' First Set of Interrogatories labeled Stipulated Exhibit #2, Industrial Commission Forms labeled Stipulated Exhibit #3, an Initial Accident and Health Claim Form labeled Stipulated Exhibit #4, the recorded statement of plaintiff labeled Stipulated Exhibit #5, and a cancelled check labeled Stipulated Exhibit #6.
2. Following the hearing before the Deputy Commissioner, defendants made a motion that the Commission take judicial notice of weather conditions in areas near the Outer Banks for the dates February 1, 2002 through February 5, 2002. Plaintiff responded and objected to the appropriateness of defendants' motion pursuant to Rule 201(e) of the North Carolina Rules of Evidence; however, plaintiff did not object to the admission of the documents themselves other than based upon relevancy. Accordingly, by order filed June 6, 2003, the documents provided by defendants containing information and data concerning precipitation for the Elizabeth City and Manteo, North Carolina areas in the form of an affidavit from a Certified Consulting Meteorologist and data from the State Climate Office of North Carolina were received into evidence by agreement of the parties.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty years old with a GED and lived in Hertford for approximately nine or ten years. Prior to his employment with defendant-employer, plaintiff worked for approximately 3 years as a manager in the water bottle industry performing water bottle service, which was a physical job requiring lifting and manual labor. While working in this employment, plaintiff was acquainted with Mr. William Bosquet, owner and manager of defendant-employer, a small family owned and managed operation. Ms. Diane Bosquet, the owner's wife, was responsible for billing and paper work.
2. Plaintiff began his full-time employment as a water technician with defendant-employer on September 11, 2000 but began working part-time for defendant-employer approximately a year and a half earlier. Plaintiff's duties as a water technician included installing commercial and home systems and performing service work on the systems as well as delivering salt to the homes where systems were installed. Plaintiff used chemicals or a machine to correct water quality including the use of a salt hopper for ion exchange, which typically required the use of 50-pound bags of salt, which were carried either in bulk on a pallet or several bags alone in the back of a flat bed truck. Plaintiff typically positioned the truck as close to a house as possible in order to unload the heavy bags of salt. While Mr. Bosquet eventually hired a worker to perform salt delivery, all workers including plaintiff and Mr. Bosquet were required to perform salt delivery. Plaintiff's work was physically demanding and both plaintiff and Mr. Bosquet would develop occasional muscle aches and pains.
3. On Saturday February 2, 2002, plaintiff contends that he suffered an injury to his lower back while he was performing his duties with defendant-employer as a water technician. According to plaintiff, he and Mr. Bosquet had been working together in Dare County during the morning of February 2, 2002. Plaintiff left Mr. Bosquet in Nags Head at approximately 12:30 p.m. and proceeded to make service calls delivering salt in Kitty Hawk for the afternoon. While the weather records for Manteo and Elizabeth City indicate no precipitation in inches for that day, plaintiff recalls "drizzle" in Kitty Hawk that afternoon. According to plaintiff, he was carrying salt bags under a house on pylons. Plaintiff testified that he was required to stretch, reach and bend while lifting the second or third bag of salt off of the three to four foot high flat bed truck, which required him to reach above his shoulders onto a pallet which was not full. Plaintiff testified that during the unloading he felt a twinge in his low back and accordingly placed the bag of salt onto his left shoulder and continued to work throughout the day until 3:30 p.m. or 4:00 p.m., thinking only that he pulled a muscle. Plaintiff returned the truck to the warehouse and did not see Mr. Bosquet who often works from his home. However, plaintiff believes that he telephoned Mr. Bosquet and indicated to Mr. Bosquet that he had pulled a muscle and that Mr. Bosquet responded to take Sunday off. Mr. Bosquet did not recall this conversation but indicated that with heavy-duty work it was routine to experience muscle pains.
4. Plaintiff did not seek medical treatment as he felt he had only pulled a muscle. Instead, plaintiff treated himself with Ben Gay, Tylenol and rest.
5. Plaintiff returned to work on Monday February 4, 2002 with Mr. Bosquet but plaintiff remained sore and felt sharp pain that day but did not suffer any additional incident. Plaintiff contends that he reported his injury to Mr. Bosquet on February 4, 2002. However, Mr. Bosquet does not recall plaintiff reporting any injury but only indicating that his back was sore, which was not unusual based upon the physical nature of the work. Plaintiff continued working from February 4, 2002 through February 13, 2002 when he left to go on an anniversary trip with his wife to Williamsburg, Virginia. While plaintiff earned his regular salary throughout this time and performed his normal duties, he continued to experience worsening pain. In fact, according to Mr. Bosquet's observations of plaintiff between February 4, 2002 and February 13, 2002, plaintiff appeared to be in pain. While on the trip to Williamsburg, plaintiff's condition worsened and he and his wife were unable to enjoy their vacation. Thereafter, plaintiff was unable to return to work and notified Mr. Bosquet, who first recalls being aware of plaintiff's claim for a work-related injury on February 19, 2002.
6. Plaintiff initially presented for medical treatment on February 17, 2002, to Albemarle Hospital where he reported back pain for two weeks with some left leg pain. While the nurse's notes indicate that plaintiff specifically denied trauma and no notes specifically document plaintiff reporting a work-related injury caused by lifting or pulling a 50 lb. bag of salt on February 2, 2002, the Emergency Physician Record contains a positive check mark notation for a recent injury.
7. On February 19, 2002, plaintiff telephoned Mr. Bosquet and reported the alleged work-related injury without any specific details regarding a bag of salt and plaintiff followed up his telephone conversation with an email to Mr. Bosquet. Plaintiff reported to Mr. Bosquet, via email, that he had injured his back while performing various duties on February 2, 2002 and had "unknowingly" injured himself while "bending, pulling, twisting, or lifting" but plaintiff did not know specifically how he had injured himself. Plaintiff indicated that his pain had been constant since February 2, 2002.
8. While plaintiff had complained of minor back aches in the past to Mr. Bosquet and while plaintiff experienced a prior workers' compensation claim involving his thoracic region in the 1980s, as well as back problems with sciatica in 1991 and 1995, plaintiff continued to work performing heavy labor for defendant-employer and his previous employer for years without difficulty.
9. On February 20, 2002, plaintiff presented for treatment of back and leg pain to HealthEast Outer Banks Medical Center. Again, plaintiff did not specifically relate an injury involving lifting a bag of salt on February 2, 2002 and the medical records indicate no direct trauma. However, the triage record indicates that workers' compensation was discussed as there is a notation that plaintiff was aware that coverage for his visit was denied by the workers' compensation carrier. In addition, a form labeled Workers' Compensation Information Sheet was completed. Accordingly, the greater weight of the evidence of record demonstrates that plaintiff did in fact present for medical treatment complaining of an injury of a work-related nature. Plaintiff was diagnosed with back pain and probable degenerative disc disease, prescribed medication and referred to Dr. Chase, an orthopaedist.
10. On February 21, 2002, plaintiff provided a recorded statement to defendant-carrier at which time he indicated that he experienced an injury on February 2, 2002 in the late afternoon. Plaintiff admitted that he did not know exactly how the injury occurred but that he was performing salt deliveries and, in the afternoon, he felt a sharp pain in his back and thought that he had pulled a muscle. However, since February 2, 2002, plaintiff's condition had worsened and the pain had begun to radiate into his legs. Plaintiff could not recall how many salt deliveries he made but thought probably 15 deliveries had been made that day. When questioned further plaintiff indicated that on one of his last deliveries he was pulling a salt bag off of the truck when he felt a slight pain in the lower section of his back but he did not think anything of it.
11. Plaintiff indicated that he had suffered a workers' compensation injury to his upper back in 1981 or 1982. However, plaintiff did not mention any back complaints, which occurred during 1995 or 1991. While defendants contend that plaintiff suffered back complaints in May 2000, the greater weight of the evidence of record demonstrates that plaintiff's back difficulties in May 2000 were kidney-related. At the hearing, plaintiff admitted that he had problems with his sciatic nerve in 1995, which lasted for approximately 3 days.
12. On February 26, 2002, plaintiff sought treatment with Dr. Chase for complaints of back pain and leg pain, left greater than right. Plaintiff reported to Dr. Chase that his complaints began gradually during the afternoon of February 2, 2002 while performing work for defendant-employer. Dr. Chase prescribed medication and referred plaintiff for an MRI due to the possibility of a herniated disc. Dr. Chase also referred plaintiff to physical therapy and wrote plaintiff out of work for two weeks.
13. On April 2, 2002, plaintiff underwent an MRI, which revealed a broad based central disc herniation at L4-5 and a left paracentral and left-sided disc herniation at L5-S1. Thereafter, on April 5, 2002, plaintiff presented with a slow antalgic gate to Dr. Chase who reviewed the MRI results. Plaintiff reported continued back and leg pain with no improvement. Dr. Chase prescribed epidural injections and medication and referred plaintiff to a neurosurgeon, Dr. Sonnino.
14. On April 15, 2002, plaintiff was seen by Dr. Sonnino. Plaintiff reported to Dr. Sonnino that he was injured on February 2, 2002 while pulling a bag of salt when he felt pain in his low back, which he believed was a muscle strain. While this history and mechanism of injury are more detailed and specific than prior histories reported by plaintiff, this description is consistent for the most part with plaintiff's earlier reports and is inclusive of his job duties as performed on February 2, 2002. Plaintiff reported left leg pain greater than right leg pain and some recent pain into the shoulder blade region. Dr. Sonnino treated plaintiff conservatively with physical therapy and plaintiff returned to Dr. Sonnino on May 16, 2002 much improved. Plaintiff's exam was normal but he still had discomfort in his back with occasional mild leg aches. Dr. Sonnino kept plaintiff out of work for another four weeks due to the heavy nature of plaintiff's employment. Dr. Sonnino renewed plaintiff's prescriptions and recommended he continue with his exercises.
15. On July 9, 2002, plaintiff returned to Dr. Sonnino complaining of pain primarily in the thoracic region between his shoulder blades and arm muscle spasms. Plaintiff's new symptoms began during physical therapy for his low back complaints. Dr. Sonnino recommended cervical and thoracic x-rays and was also referred to physical therapy for neck exercises and instructed to continue his low back stretches and exercise. Plaintiff was prescribed medications for his shoulder blade and arm pain as well as for his headaches.
16. On July 11, 2002, plaintiff returned to Dr. Sonnino who interpreted the cervical x-rays as revealing muscle tension and a spur formation at C6-7 of the cervical spine. Plaintiff's thoracic x-rays were normal. Dr. Sonnino recommended continued physical therapy for the cervical and lumbar spine.
17. On August 12, 2002, plaintiff returned to Dr. Sonnino complaining of pain extending from the neck into the arms and from the lower back extending down the legs to the knees. Plaintiff indicated that his leg and back pain was aggravated the previous week when he underwent traction and physical therapy. Dr. Sonnino recommended that plaintiff undergo a cervical MRI and discontinue traction but continue physical therapy, stretches and exercise for his back and neck. Plaintiff's cervical MRI revealed a disc herniation at C6-7 for which he eventually underwent an anterior cervical diskectomy and fusion on September 4, 2002 performed by Dr. Sonnino. Thereafter, plaintiff had complications from surgery and continued to treat with Dr. Sonnino and his physician's assistant in follow up on September 18, 2002 and October 17, 2002. Plaintiff's neck and arm pain significantly improved as a result of the surgery. However, on October 17, 2002, plaintiff continued to have low back pain radiating into the legs as well as thoracic pain between the shoulder blades. Plaintiff was again referred to physical therapy for his low back and instructed to perform daily exercises.
18. On November 5, 2002, plaintiff returned to Dr. Sonnino continuing to complain of pain in the lower back extending into the legs with numbness, tingling and weakness. Plaintiff also continued to complain of thoracic pain and the sensation of a bone "popping in and out," which occurred during physical therapy. Plaintiff reported no relief with physical therapy. However, plaintiff reported no neck pain. Due to plaintiff's continued back pain, an MRI of the lumbar and thoracic spine was recommended and surgery discussed. Plaintiff's lumbar MRI revealed a left sided disc herniation at L5-S1 but normal results were found by the thoracic MRI.
19. On November 18, 2002, after reviewing the results of the lumbar MRI, Dr. Sonnino felt that while plaintiff's left leg complaints were explained by the MRI, there was no good explanation for plaintiff's right leg complaints regardless of the fact that the radiologist found some right-sided involvement. Dr. Sonnino felt that the right-sided involvement documented by the radiologist was too minor to cause any problems. Accordingly, Dr. Sonnino felt that plaintiff's pain could be muscular in nature and opted to obtain a bone scan of the thoracic spine without any further recommendations on lumbar spine surgery.
20. On November 22, 2002, plaintiff underwent a bone scan and returned to Dr. Sonnino on December 2, 2002. Dr. Sonnino found that the bone scan did not reveal any abnormalities to explain plaintiff's thoracic problems. Plaintiff continued to complain of lumbar and bilateral leg pain for which Dr. Sonnino prescribed Elavil and referred plaintiff to an anesthesiologist for possible nerve blocks.
21. On February 21, 2003, plaintiff returned to Dr. Sonnino and was seen by his physician's assistant. Plaintiff reported reduced pain in the thoracic area but continued pain in the lumbar region and legs, worse on the left than right. Plaintiff was prescribed medication, instructed to perform exercises and return for a surgical consult with Dr. Sonnino. Thereafter, plaintiff was seen by Dr. Sonnino on March 20, 2003, at which time plaintiff continued to experience pain radiating down both legs. Dr. Sonnino once again obtained an MRI, which documented plaintiff's left-sided problems but revealed no adequate reason for plaintiff's right-sided problems. At that time Dr. Sonnino did not feel that plaintiff had reached maximum medical improvement concerning his lower back condition. However, according to Dr. Sonnino, considering plaintiff's pain and back condition, plaintiff would not be able to return to any heavy activity. The greater weight of the evidence of record demonstrates that while plaintiff suffered disabling complaints which were unrelated to his lumbar condition, plaintiff was nevertheless disabled in part due to his lumbar condition, which had not fully resolved.
22. According to Dr. Sonnino, plaintiff's thoracic and cervical conditions, as well as his resulting cervical fusion surgery, are not related to the alleged injury by accident of February 2, 2002. However, based on the history provided by plaintiff, Dr. Sonnino felt that plaintiff's lumbar condition and left sided disc herniation were either caused by his work related incident of February 2, 2002 or the incident significantly contributed to his lumbar condition. While the history provided to Dr. Sonnino is not entirely consistent with plaintiff's earlier history, it is not an inadequate or inaccurate history such that Dr. Sonnino could not rely upon it in his diagnosis and determination of a causal relation.
23. Dr. Sonnino remained perplexed with regard to the etiology of plaintiff's right-sided leg complaints as he could find no clinical explanation for them. Accordingly, Dr. Sonnino did not recommend surgery at that time but considered it a possibility. Furthermore, if plaintiff's unrelated digestive complaints permit, plaintiff is in need of a functional capacity evaluation to determine his current work ability. Accordingly, plaintiff is in need of a return visit to Dr. Sonnino for consideration of the feasibility of this testing at this time.
24. Defendants contend that plaintiff may have injured himself in early February 2002 while performing a side job, which was not performed in the course and scope of plaintiff's employment with defendant-employer but rather performed by plaintiff and his son for one of defendant-employer's new customers, Mr. Nugent. Plaintiff, his wife, Diana Elkie, and their son, Kenneth Elkie, contend that the floor work for Mr. Nugent occurred earlier, sometime between September and November 2001. Plaintiff's daughter Chrystal Elkie was also offered as a corroborative witness.
25. According to Ms. Kathryn Bosquet, a $1,500.00 deposit for future installation work for Mr. Nugent was received by defendant-employer on January 19, 2002. Ms. Bosquet also indicated that a check for $250.00 for the side work performed by plaintiff was also mailed to her by Mr. Nugent in the same envelope as the check for the installation deposit on January 19, 2002. However, the $250.00 check from Mr. Nugent to plaintiff was dated February 12, 2002. Furthermore, according to Ms. Bosquet there is no record of work being performed by plaintiff or defendant-employer on February 2, 2002 according to defendant-employer's records. However, defendant-employer's documentation and billing processes were not performed consistently and the company's records are in disarray.
26. Based on the greater weight of the evidence of record, plaintiff more than likely performed the floor work for Mr. Nugent in January 2001. Furthermore, the greater weight of the evidence shows plaintiff was in fact working for defendant-employer on February 2, 2002 and any evidence to the contrary is a result of poor record keeping on the part of defendant-employer.
27. The greater weight of the evidence demonstrates that plaintiff suffered an injury by accident by way of a specific traumatic incident during a cognizable period on or about February 2, 2002 while performing heavy duty labor including lifting 50 pound bags of salt in the course and scope of his employment with defendant-employer. Furthermore, although plaintiff experienced an inability to work due in part to unrelated neck and thoracic conditions, the greater weight of the evidence including plaintiff's low back condition, pain complaints, education, and work experience as well as Dr. Sonnino's testimony, demonstrates that plaintiff has been unable to earn the same or greater wages due to his February 2, 2002 injury since February 13, 2002 and continuing. However, according to Ms. Bosquet plaintiff was paid for the entirety of his last pay period, which extended beyond February 13, 2002 until February 22, 2002.
28. Plaintiff's average weekly wage at the time of his injury was $769.22 per week yielding a compensation rate of $513.07.
29. At the time of the hearing before the Deputy Commissioner, plaintiff had not reached maximum medical improvement from the injuries he sustained as the result of his February 2, 2002 injury by accident.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The greater weight of the evidence of record demonstrates that plaintiff sustained an injury by accident arising out of and in the course of his employment on February 2, 2002 by way of a specific traumatic incident occurring during a cognizable time period resulting in a low back injury including a left-sided disc herniation at L5-S1. To the extent that plaintiff experienced pre-existing lumbar and sciatica complaints, his condition was materially aggravated by the February 2, 2002 injury. However, plaintiff has failed to prove by the greater weight that his February 2, 2002 specific traumatic incident resulted in a cervical or thoracic condition. N.C. Gen. Stat. § 97-2(6).
2. As a result of his specific traumatic incident, plaintiff has been unable to earn the same or greater wages since February 13, 2002 and continuing. Therefore, plaintiff is entitled to temporary total disability at a weekly compensation rate of $513.07 from February 13, 2002 and continuing until plaintiff returns to work at the same or greater wages or until further order of the Commission. Plaintiff's entitlement to temporary total disability beginning February 13, 2002 is subject to a credit for any wages paid to plaintiff by defendant-employer after February 13, 2002. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to reasonably necessary medical expenses for treatment incurred or to be incurred as a result of his specific traumatic incident, which resulted in his lumbar condition for so long as such treatment tends to effect a cure, provide relief or lessen the period of disability, subject to statutory limitations. Furthermore, a functional capacity evaluation as contemplated by Dr. Sonnino is reasonably necessary to lessen the period of plaintiff's disability. N.C. Gen. Stat. §§ 97-25; 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability at a weekly compensation rate of $513.07 from February 13, 2002 and continuing until plaintiff returns to work at the same or greater wages or until further order of the Commission. Plaintiff's entitlement to temporary total disability beginning February 13, 2002 is subject to a credit for any wages paid to plaintiff by defendant-employer after February 13, 2002 and subject to a reasonable attorney's fee approved herein. All accrued compensation shall be paid in one lump sum.
2. Defendants shall pay all reasonably necessary medical expenses for treatment incurred or to be incurred by plaintiff as a result of his specific traumatic incident, which resulted in his lumbar condition when bills are submitted and approved in accordance with Industrial Commission procedure and for so long as such treatment tends to effect a cure, provide relief or lessen the period of disability, subject to statutory limitations.
3. A reasonable attorney's fee in the amount of twenty-five percent of the compensation due plaintiff under paragraph one of this award is approved for plaintiff's counsel. Thereafter, every fourth check shall be deducted from the sum due plaintiff and paid directly to his counsel.
4. Defendants shall pay the costs due the Commission as well as the expert witness fee due Dr. Sonnino, if not already paid.
This the ___ day of March, 2004
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER